**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MILTON S. HERSHEY MEDICAL CENTER et al.,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 23-1382 (JDB)** |
| **XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services,** | |
| **Defendant.** | |
| **ALBERT EINSTEIN MEDICAL CENTER et al.,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 23-1384 (JDB)** |
| **XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

This consolidated case is a follow-on to an earlier dispute concerning the Medicare program's reimbursement of hospitals for training medical residents and fellows.  In <u>Milton S. Hershey Medical Center v. Becerra</u> ("<u>Hershey I</u>"), Civ. A. No. 19-2680 (TJK), 2021 WL 1966572 (D.D.C. May 17, 2021), Judge Kelly held that Medicare's payment formula was inconsistent with the Medicare statute as applied to the hospital plaintiffs before him and ordered the Secretary of the Department of Human Services (and its component the Centers for Medicare and Medicaid Services) ("CMS" or "the Secretary") to recalculate the payments at issue in that case.  In response

1

to <u>Hershey I</u>, CMS admitted that its prior regulation was inconsistent with the Medicare statute and adopted a retroactive regulation revising the payment formula.  However, CMS limited the regulation's retroactive effect to payments that were still disputed or pending.  In the present case, thirty-one hospitals seek an order of mandamus requiring CMS to reopen and recalculate all payments made to them—dating back to 2001—based on the now-defunct regulation.  For the following reasons, the Court will deny mandamus and grant summary judgment to CMS.

**Background**

I.   **Statutory and Regulatory Background**

   A.  **Direct Graduate Medical Education Payments**

The federal government supports physician training through several funding programs.  <u>See</u> Cong. Rsch. Serv., <u>Federal Support for Graduate Medical Education: An Overview</u> 7, 31 (updated Dec. 27, 2018), https://crsreports.congress.gov/product/pdf/R/R44376 ("CRS Report").  The largest of these programs funds graduate medical education ("GME").  <u>Id.</u> at 7.  Through GME, the federal government pays a portion of the costs that hospitals and other providers incur while training medical residents and fellows, including resident salaries, supervisory physician salaries, and administrative costs.  <u>Id.</u> at 10–11.  A medical resident has completed medical school and is in training to become a licensed physician in a primary specialty.  <u>Id.</u> at 2.  A fellow is a physician who has completed the initial residency and is pursuing additional specialty training.  <u>Id.</u> at 3.  Medicare, the federal health insurance program for the elderly and disabled, has paid some portion of GME costs since Medicare's inception in 1965.  <u>See id.</u> at 7.

Over the years, Congress has implemented some limits on Medicare's GME expenditures.  In 1986, Congress implemented a payment formula approximating the share of medical training costs associated with Medicare patients at each hospital, and the level of training the residents and

2

fellows have already received.  Consolidated Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-272, § 9202, 100 Stat. 82, 171–77 (codified as amended at 42 U.S.C. § 1395ww(h)). Under 42 U.S.C. § 1395ww(h), direct graduate medical education ("DGME") payments are calculated as the product of a hospital's "medicare patient load" and its "aggregate approved amount."  Id. § 1395ww(h)(3).  Patient load is the percentage of a hospital's inpatient-bed-days attributable to Medicare patients.  Id. § 1395ww(h)(3)(C).  The aggregate approved amount is calculated as the product of the hospital's approved cost-per-resident, id. § 1395ww(h)(2), and the weighted average number of residents employed by the hospital.  Id. § 1395ww(h)(3)(B). Generally, medical residents are weighted at 1.00 and fellows are weighted at 0.50.  Id. § 1395ww(h)(4)(C)(ii), (iv).  Hence, the statute requires that medical residents' time is fully counted, while only half of fellows' time factors into the calculation.

Eleven years later, Congress imposed further limitations on Medicare's DGME payments. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4623, 111 Stat. 251, 477–78 (codified as amended at 42 U.S.C. § 1395ww(h)(4)(F)(i)).  This time, Congress capped the actual, unweighted number of full-time-equivalent ("FTE") residents and fellows that each hospital could claim for reimbursement at the number reported in 1996.  42 U.S.C. § 1395ww(h)(4)(F)(i).  Under the statute, hospitals were prohibited from claiming reimbursement for any medical residents or fellows above the 1996 levels.  Following this enactment, and pursuant to its statutory authority to "establish rules consistent with [42 U.S.C. § 1395ww(h)(4)], for the computation of the number of full-time-equivalent residents in an approved medical residency training program," id. § 1395ww(h)(4)(A), CMS promulgated a rule addressing "situations in which a hospital increases the number of FTE residents over the cap."  Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1998 Rates, 63 Fed. Reg. 26318, 26330 (May 12,

1998).  This regulation calculated the weighted average number of residents employed by the hospital by first dividing the 1996 cap by the actual number of unweighted FTEs, and then multiplying the resulting figure by the number of weighted FTEs.  42 C.F.R. § 413.79(c)(2)(iii) (2021).  The formula "operate[d] to reduce the weighted number of FTEs a hospital may claim for reimbursement when that hospital's unweighted FTE count exceeds the 1996 cap."  Hershey I, 2021 WL 1966572, at *2.  "When a hospital exceed[ed] the cap, its weighted FTE count [was] reduced commensurate with the amount by which the hospital exceed[ed] the cap."  Id.

In 2019, about two decades after the weighting regulation was enacted, numerous hospitals challenged their DGME reimbursements before the Provider Reimbursement Review Board ("Board") within CMS, on a basis not previously asserted during the rulemaking process.  Hershey I, 2021 WL 1966572, at *2–3.  Because the Board lacked legal authority to decide the validity of a Medicare regulation, it granted expedited judicial review allowing the parties to file suit in federal court.  Id. at *3.  Many did, and five suits involving dozens of hospital plaintiffs were consolidated before Judge Kelly in Hershey I.  Id. at *2.  The hospitals, all of which employed more residents and fellows than allowed under the 1996 cap, contended that CMS's FTE weighting regulation was contrary to the Medicare statute.  Id. at *3.  Judge Kelly agreed, concluding that the regulation was inconsistent with the clear, unambiguous text of the statute because it assigned different weights to residents and fellows than provided for by the statute.  Id. at *5–6.  Specifically, when hospitals both exceeded their 1996 caps and employed fellows, the formula disproportionately reduced their weighted FTE number as to no longer reflect the statutory weights of 1.00 and 0.50.  Id. at *5.  Accordingly, Judge Kelly concluded that the regulation was "unlawful as applied to [the plaintiff hospitals]," id. at *5, granted summary judgment to the hospitals, and remanded to CMS

to "as promptly as practicable in a manner consistent with the Court's Opinion, recalculate [the hospitals]' DGME payments," Order, <u>Hershey I</u>, ECF No. 34.

In the wake of <u>Hershey I</u>, CMS acknowledged that its prior DGME weighting regulation was inconsistent with the Medicare statute and enacted a "modified policy" after notice and comment.  Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems, 87 Fed. Reg. 48780, 49067, 49069 (Aug. 10, 2022) (final rule) ("Retroactive DGME Rule").  The new regulation "address[es] situations for applying the FTE cap when a hospital's weighted FTE count is greater than its FTE cap."  <u>Id.</u> at 49067.  In such situations, the hospital's weighted FTE counts are "adjusted to make the total weighted FTE count equal the FTE cap."  <u>Id.</u>  CMS made the regulation retroactive to October 1, 2001.  <u>Id.</u> at 49071.  CMS stated in the Final Rule that retroactivity was necessary to comply with its duty to make regulations governing the computation of FTEs and because "it would be inconsistent with the statute to calculate past payments for <u>open</u> cost reports based on a rule inconsistent with the law, particularly where a court ordered us to recalculate payments to plaintiffs."  <u>Id.</u> at 49067 (emphasis added); <u>see</u> <u>id.</u> at 49069.  However, CMS stated that the rule "would not be the basis for reopening final settled [cost reports]."  <u>Id.</u> at 49067.  Indeed, CMS contended that separate regulations prohibited reopening closed cost reports on this basis.  <u>Id.</u> at 49070.  It is to those reopening regulations that the Court now turns.

## B.  Reopening Medicare Cost Reports

Medicare reimbursements are commonly handled in the first instance by private insurance companies, which calculate the amount owed to the provider under the applicable regulations.  42 U.S.C. § 1395f(b)(1).  On an annual basis, the intermediary issues an annual cost report detailing the amount of reimbursement.  <u>Id.</u> §§ 1395g, 1395h, 1395x(v)(1)(A)(ii).  CMS has promulgated regulations, pursuant to its general rulemaking authority, that permit the reconsideration—known

as "reopening"—of cost reports under certain circumstances.  See HCA Health Servs. of Okla., Inc. v. Shalala, 27 F.3d 614, 618 (D.C. Cir. 1994).  Under the present regulations,

> A Secretary determination, a contractor determination, or a decision by a reviewing entity (as described in § 405.1801(a)) may be reopened, with respect to specific findings on matters at issue in a determination or decision, by CMS (with respect to Secretary determinations), by the contractor (with respect to contractor determinations), or by the reviewing entity that made the decision (as described in paragraph (c) of this section).

42 C.F.R. § 405.1885(a)(1).[1]  A determination or decision "may be reopened and revised at any time if it is established that the determination or decision was procured by fraud or similar fault of any party to the determination or decision."  Id. § 405.1885(b)(3).  In the absence of "fraud or similar fault," reopening must be sought within "3 years after the date of the determination or decision that is the subject of the requested reopening."  Id. § 405.1885(b)(2)(i).

Jurisdiction to reopen a contractor's determination or decision rests exclusively with the contractor, "subject to a directive from CMS to reopen or not reopen the determination or decision."  42 C.F.R. § 405.1885(c).  "CMS may direct a contractor or contractor hearing officer(s) to reopen and revise any matter, subject to [certain limitations], by providing explicit direction to the contractor or contractor hearing officer(s) to reopen and revise."  Id. § 405.1885(c)(1).  As an "[e]xample[]" of a CMS-directed reopening, the regulation offers that

> A contractor determination or contractor hearing decision must be reopened and revised if CMS provides explicit notice to the contractor that the contractor determination or the contractor hearing decision is inconsistent with the applicable law, regulations, CMS ruling, or other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS in effect, and as CMS understood those legal provisions, at the time the determination or decision was rendered by the contractor.

---

[1] Except as otherwise indicated, the Court refers to the presently operative reopening regulation last amended in 2020, which was in effect when CMS adopted the Retroactive DGME Rule and when the providers appealed to the Provider Reimbursement Review Board.

Id. § 405.1885(c)(1)(i).  However, reopening based on a "change of legal interpretation or policy by CMS in a regulation, CMS ruling, or other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS, whether made in response to judicial precedent or otherwise" is "[p]rohibited" and "not a basis for reopening a CMS or contractor determination."  Id. § 405.1885(c)(2).

## II.    Factual and Procedural Background

This consolidated case involves thirty-one hospitals which seek reopening and revision of their Medicare cost reports from 2001 onward to account for CMS's new DGME weighting formula promulgated after Hershey I.  See Compl. for Writ of Mandamus & Sums Due Under the Medicare Act ¶ 1, Milton S. Hershey Med. Ctr. v. Becerra ("Hershey II"), Civ. A. No. 23-1382 (JDB), ECF No. 1 ("Hershey II Compl."); Compl. for Writ of Mandamus & Sums Due Under the Medicare Act ¶ 1, Albert Einstein Med. Ctr. v. Becerra ("Einstein"), Civ. A. No. 23-1384 (JDB), ECF No. 1 ("Einstein Compl.").[2]

The hospital plaintiffs are all teaching hospitals that have employed a higher number of medical residents and fellows than allowed under their 1996 statutory cap.  See Hershey II Compl. ¶¶ 60–61; Einstein Compl. ¶¶ 63–64.  Because the hospitals also employed fellows, CMS's prior methodology had the effect of reducing their reimbursements below the statutorily allowed amount in their final cost reports.  See Hershey II Compl. ¶ 61; Einstein Compl. ¶ 64; Hershey I, 2021 WL 1966572, at *5.

Most of the plaintiffs in this consolidated case were also plaintiffs in Hershey I or another similar case filed in this District.  See Hershey II Compl. ¶ 62; Einstein Compl. ¶ 65.  After the

---

[2] On October 12, 2023, the Hershey II plaintiffs, with the consent of the Einstein plaintiffs and CMS, moved to consolidate "because both cases raise virtually identical claims."  Pls.' Consent Mot. to Consolidate Cases [ECF No. 17] at 1.  The Court granted the motion to consolidate.  Oct. 13, 2023 Min. Order.  Because Hershey II was the earlier-numbered, the Einstein case was transferred to this Court.  Id.; see LCvR 40.5(d).

plaintiffs prevailed in Hershey I, CMS recalculated their payments for the cost reports at issue in that case. See Hershey II Compl. ¶ 1; Einstein Compl. ¶ 1; Order, Hershey I, ECF No. 34 (ordering CMS to "recalculate Plaintiffs' DGME payments"). CMS also adopted the new, retroactive DGME weighting regulation, as discussed above. Retroactive DGME Rule, 87 Fed. Reg. at 49067–69. However, in its retroactive regulation, CMS declined to apply the new formula to their closed, settled cost reports. Retroactive DGME Rule, 87 Fed. Reg. at 49070; see Hershey II Compl. ¶ 1; Einstein Compl. ¶ 1. Plaintiffs appealed CMS's refusal to apply the new formula to closed, settled cost reports to the Board. See J.A., Vol. I [ECF No. 27-2] at 22–25.[3] The Board concluded that it lacked jurisdiction over the appeals as the policy was not a "'final determination' within the context of 42 U.S.C. § 1395oo(a)(1) because the policy has no reimbursement impact on cost reports at issue that have already been settled and closed." Id. at 22 (footnote omitted). The Board reasoned that 42 U.S.C. § 1395oo(a) allows appeals of final payment determinations, but the "crux" of the hospitals' complaint was that "their payment amounts have not been, and will not be, set to a different amount." Id. at 22–23. Accordingly, the hospitals' appeals were, in effect, requests to reopen final cost reports, decisions precluded from administrative and judicial review under Your Home Visiting Nurse Services, Inc. v. Shalala, 525 U.S. 449, 452–56 (1999). The Board further rejected the hospitals' arguments for reopening on the merits. J.A., Vol. I at 25–27.

The hospitals then filed the present, now-consolidated suits seeking an order of mandamus requiring CMS to recalculate their cost reports from prior years based on the newly adopted formula. Hershey II Compl. ¶ 1; Einstein Compl. ¶ 1. The hospitals moved for summary judgment, contending that CMS's reopening regulations require CMS to revisit their cost reports

---

[3] The decision cited appears in the Administrative Record for the Hershey II plaintiffs. An identical decision was rendered to the Einstein plaintiffs. See J.A., Vol. III [ECF No. 27–4] at 2339–57. The Court's citations to the Joint Appendix reflect the Joint Appendix pagination.

dating back to October 1, 2001.  See Pls.' Mem. of P. & A. in Supp. of Mot. for Summ. J. [ECF No. 20-1] ("Pls.' Mot.") at 21–23.  Specifically, the hospitals argue that CMS must reopen cost reports because CMS gave "explicit notice" that the prior cost reports were calculated inconsistent with the law and implemented a retroactive rule.  Id. at 23–30.  Further, the hospitals contend that the standard three-year time limit on reopening does not apply because CMS committed "fraud or similar fault" by maintaining a DGME weighting formula inconsistent with statutory requirements. Id. at 30–32.

CMS opposed the hospitals' motion and cross-moved for summary judgment.  See Mem. in Supp. of Def.'s Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. [ECF No. 21-1] ("Def.'s Cross-Mot. & Opp'n").  CMS contends that the hospitals are not entitled to mandamus because they failed to exhaust their adequate, alternative remedies by seeking judicial review of the Board's decision under 42 U.S.C. § 1395oo(f).  Id. at 13–15.  CMS further argues that it has no duty to reopen the hospitals' settled cost reports on account of a new legal interpretation and is, in fact, prohibited by regulation from doing so.  Id. at 18–23.  Finally, CMS argues that many of the hospitals' claims are untimely because they were filed outside the three-year reopening window and CMS did not engage in any "fraud or similar fault" that would warrant late reopening.  Id. at 16–18.  The hospitals submitted an opposition and reply, Pls.' Mem. in Opp'n to Defs.' Cross-Mot. & in Reply to Def.'s Opp'n [ECF No. 24] ("Pls.' Reply & Opp'n"), and CMS submitted a reply, Def.'s Reply to Pls.' Opp'n to Def.'s Cross-Mot. [ECF No. 26] ("Def.'s Reply").  The motions are now fully briefed and ripe for resolution.

## Legal Standard

A court may only grant mandamus relief under 28 U.S.C. § 1361 upon a showing that (1) the plaintiff has a clear and indisputable right to relief, (2) the defendant has a clear duty to act,

and (3) the plaintiff has no adequate alternate remedy.  Lovitky v. Trump, 949 F.3d 753, 759 (D.C. Cir. 2020).  "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction."  Id. (quoting Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 189 (D.C. Cir. 2016)).  "In other words, 'mandamus jurisdiction under § 1361 merges with the merits.'"  Id. (quoting In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005)).

"Few legal standards are more exacting than the requirements for invoking mandamus jurisdiction."  Illinois v. Ferriero, 60 F.4th 704, 714 (D.C. Cir. 2023).  Even when the legal requirements of mandamus are satisfied, the court may grant relief "only when it finds compelling [] equitable grounds."  In re Medicare Reimbursement Litig., 414 F.3d 7, 10 (D.C. Cir. 2005) (quoting 13th Reg'l Corp. v. U.S. Dep't of Interior, 654 F.2d 758, 760 (D.C. Cir. 1980)).  The party seeking mandamus carries the burden on each element.  Illinois, 60 F.4th at 713–14.

## Analysis

The hospitals contend that they are entitled to an order of mandamus directing CMS to reopen and revise their historical cost reports to reflect the appropriate weighting formula for DGME payments.  Pls.' Mot. at 23–30.  The hospitals source CMS's duty to revise and reopen their cost reports in CMS's reopening regulations.  See 42 C.F.R. § 405.1885.  An agency "can create a non-discretionary duty by binding itself through a regulation carrying the force of law." Elec. Priv. Info. Ctr. v. IRS, 910 F.3d 1232, 1244 (D.C. Cir. 2018).  To determine whether the agency has created such a regulation, "the court must interpret the [regulation] and if, 'once interpreted,' the [regulation] 'creates a peremptory obligation for the officer to act, a mandamus action will lie.'"  Lovitky, 949 F.3d at 760 (quoting 13th Reg'l Corp., 654 F.2d at 760).  When interpreting the regulation, the court "must carefully consider [its] text, structure, history, and purpose."  Kisor v. Wilkie, 139 S. Ct. 2400, 2415 (2019) (plurality opinion) (cleaned up); see also

Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs., 573 F. Supp. 3d 294, 312–15 (D.D.C. 2021).[4]

The parties' dispute principally turns on interpretation of three paragraphs of CMS's reopening regulation, which provide as follows:

> **(1) CMS-directed reopenings.**  CMS <u>may direct</u> a contractor or contractor hearing officer(s) to reopen and revise any matter, subject to the time limits specified in paragraph (b) of this section, and subject to the limitation expressed in paragraph (c)(2) of this section, by providing <u>explicit direction</u> to the contractor or contractor hearing officer(s) to reopen and revise.
>
> > **(i) Examples.**  A contractor determination or contractor hearing decision must be reopened and revised if CMS provides <u>explicit notice</u> to the contractor that the contractor determination or the contractor hearing decision is inconsistent with the applicable law, regulations, CMS ruling, or other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS in effect, and <u>as CMS understood those legal provisions, at the time the determination or decision was rendered by the contractor</u>. . . .
>
> **(2) Prohibited reopenings.**  A change of legal interpretation or policy by CMS in a regulation, CMS ruling, or other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS, whether made in response to judicial precedent or otherwise, is not a basis for reopening a CMS or contractor determination, a contractor hearing decision, a CMS reviewing official decision, a Board decision, or an Administrator decision, under this section.

42 C.F.R. § 405.1885(c)(1)–(2) (emphasis added).

## I.  CMS-Directed Reopenings

The hospitals contend that CMS has a clear, non-discretionary duty to reopen and revise contractor determinations if it "provides explicit notice" to the contractor that the contractor's "decision is inconsistent with the applicable law." <u>See</u> Pls.' Mot. at 23–30.  CMS disagrees.  CMS argues that the operative language of the regulation is the first paragraph, which states what CMS

---

[4] CMS does not seek any deference to its interpretation of the reopening regulation.  <u>See</u> Def.'s Reply at 13 n.5 (disclaiming reliance on <u>Kisor</u>, 139 S. Ct. 2400).

"may" do, not the subparagraph labeled "examples" on which the hospitals rely. See Def.'s Cross-Mot. & Opp'n at 18–23. CMS asserts that the regulation confers discretion on it to reopen or not by issuing an explicit direction, and that mere notice of legal inconsistency is not enough to trigger a CMS-directed reopening. Id. The question for the Court, then, is whether "explicit notice" is an example of "explicit direction" or merely an illustration of a circumstance in which "explicit direction" might be appropriate.

### A.  Text & Structure

"As always, the starting point of analysis is the text of the [regulation]." Meredith v. Fed. Mine Safety & Health Rev. Comm'n, 177 F.3d 1042, 1053 (D.C. Cir. 1999). Here, a cursory examination of the text might suggest some ambiguity. A plain reading of paragraph (1) indicates that CMS has discretion whether to order a reopening, and that CMS exercises that discretion by issuing an explicit directive. But the immediate subsidiary provision—subparagraph (1)(i)—employs mandatory language, indicating that a contractor determination "must" be reopened "if CMS provides explicit notice." The use of "must" raises the possibility that CMS's "explicit notice" is a form of "explicit direction" that, once given, creates a mandatory duty for the contractor to reopen.

However, a reading of the text to find that CMS's "explicit notice" is a form of "explicit direction" is not the best reading for two reasons. In plain language, notice and direction are not the same; CMS could certainly give notice that a contractor was wrong without directing the contractor to reopen. Indeed, that result would be required if notice was provided more than three years after the determination was rendered and there was no "fraud or similar fault," or if reopening would otherwise be prohibited. See 42 C.F.R. § 405.1885(b), (c)(2). Second, the mandatory language appears in a subparagraph to a paragraph affording CMS discretion to direct a reopening

"by providing explicit direction."   Id. § 405.1885(c)(1).   The subparagraph is further labeled "examples"—a very strong indication that the initial paragraph is operative and the subparagraph only illustrative.   To read the words otherwise would violate "'the cardinal rule that a [regulation] is to be read as a whole,' 'since the meaning of [regulatory] language, plain or not, depends on context.'"   Meredith, 177 F.3d at 1054 (first quoting King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991); and then quoting Conroy v. Aniskoff, 507 U.S. 511, 515 (1993)).   Accordingly, the text provides CMS discretion to reopen "any matter" and indicates that CMS only exercises that discretion through an explicit directive.

### B.  History & Purpose

To the extent that the text of the regulation leaves any ambiguity as to its meaning, the regulation's history and purpose are dispositive.  CMS adopted its current reopening regulation as a clear rejection of a D.C. Circuit decision that interpreted a prior version of the regulation to require CMS to reopen contractor determinations upon notice that a prior determination was inconsistent with applicable law.  CMS's contemporaneous explanation of subsequent changes in the Federal Register strongly supports the conclusion that explicit notice of a legal inconsistency is no longer sufficient to obligate CMS to reopen prior contractor determinations.[5]

Before 2002, the reopening regulation provided that a determination or decision rendered by an intermediary "shall be reopened and revised by the intermediary if, within the aforementioned 3-year period, [CMS] notifies the intermediary that such determination or decision is inconsistent with the applicable law, regulations, or general instructions issued by [CMS] in

---

[5] In relying on CMS's contemporaneous statements in the Federal Register and on the regulatory history of the regulations in this case, the Court does not afford CMS any deference.  When determining the meaning of a regulation in the first instance, courts have, before and after Kisor, 139 S. Ct. at 589, consulted regulatory history as evidence of a regulation's meaning.  See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 669 (2007); Gardebring v. Jenkins, 485 U.S. 415, 429 n.14 (1988); Open Soc'y Inst., 573 F. Supp. 3d at 312–15.  Here, the Court consults regulatory history, together with the text, as evidence of the reopening regulation's intended meaning.

accordance with [CMS's] agreement with the intermediary."   42 C.F.R. § 405.1885(b) (2001)

(emphasis added).   In <u>Monmouth Medical Center v. Thompson</u>, 257 F.3d 807 (D.C. Cir. 2001),

the D.C. Circuit interpreted this regulation to "<u>mandate</u>[] reopening in one special circumstance,"

that is, when CMS provided notice that a prior decision was inconsistent with applicable law.  257

F.3d at 809.  The critical dispute in <u>Monmouth</u> was whether CMS actually notified the contractors

that their prior determinations were inconsistent with law.  <u>See</u> <u>id.</u> at 813–14.  Because of the

operative "shall" language, the D.C. Circuit held that CMS had a mandatory duty so long as it

fulfilled the relevant condition.  <u>Id.</u>

  In response to <u>Monmouth</u>, CMS revised its reopening regulations to better comport with

its "longstanding interpretations of the reopening regulations, which [CMS] believe[d] were

misapprehended by the courts."  Medicare Program; Changes to the Hospital Inpatient Prospective

Payment Systems and Fiscal 2003 Rates, 67 Fed. Reg. 49982, 50100 (Aug. 1, 2002) (final rule)

("Amended Reopening Rule").   The rule was amended to state that an intermediary's

determination or decision "must be reopened and revised" if CMS "[p]rovides notice to the

intermediary that the intermediary determination or the intermediary hearing decision is

inconsistent with the applicable law" and "<u>[e]xplicitly directs the intermediary to reopen and revise</u>

<u>the intermediary determination</u>."  42 C.F.R. § 405.1885(b)(1) (2003) (emphasis added).  Hence, in

the new regulation, CMS removed the "shall be reopened" language that rendered reopening

mandatory when "explicit notice" was given.   And by adding the requirement of "explicit

direction," CMS indicated that "explicit notice" was no longer enough to trigger reopening.

  CMS made its intent plain in the preamble to the final regulations, stating its goal "to make

clear that, in order to trigger the intermediary's obligation to reopen, our notice to the intermediary

must explicitly direct the intermediary to reopen based on a finding that an intermediary

determination or an intermediary hearing decision is inconsistent with the law."   Amended Reopening Rule, 67 Fed. Reg. at 50096–97; see also id. at 50098.

Further amendments have been made to the reopening regulation since 2003, but the history of those amendments only strengthens the Court's view that reopening is no longer mandatory absent an explicit directive.  In an amendment proposed in 2004 and finally adopted in 2008, CMS reorganized the reopening regulation.  The revised regulation retained the requirement that CMS provide explicit direction to the contractor or contractor hearing officer(s) to reopen and revise but relocated the language relating to "notice to the intermediary that the intermediary determination or the intermediary hearing decision is inconsistent with the applicable law" to the subparagraph labeled "Examples."  Compare 42 C.F.R. § 405.1885(b)(1) (2003), with 42 C.F.R. § 405.1885(c)(1) (2009).  In the 2004 Notice of Proposed Rulemaking, CMS stated that the revised rule was intended to reflect the same purpose set forth in the 2002 rule: "requiring an explicit direction to reopen and revise [] to prevent any misunderstanding as to whether CMS has directed a reopening, including a claim that CMS has impliedly directed a reopening through publication or issuance of a change in policy."  Medicare Program; Provider Reimbursement Determinations and Appeals, 69 Fed. Reg. 35716, 35741 (June 25, 2004) (proposed rule).  CMS "propose[d] to place [the language concerning reopenings based on determinations inconsistent with the applicable law] under the heading of 'Example' to further reinforce the discretionary nature of reopenings, including CMS-directed reopenings, and to avoid implying that CMS must direct an intermediary or intermediary hearing officer(s) to reopen in such a situation."  Id.  No comments were raised about these changes, and CMS adopted the language of the Proposed Rule in 2008.

Medicare Program; Provider Reimbursement Determinations and Appeals, 73 Fed. Reg. 30190, 30230–34 (May 23, 2008) (final rule).[6]

While language in regulatory preambles is "not controlling over the language of the regulation itself," "the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules" and serves "as a source of evidence concerning contemporaneous agency intent." Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 53 (D.C. Cir. 1999). In adopting the regulation at issue in this case, CMS clearly evinced its intent to prevent Monmouth from being applied in future, similar circumstances. The hospitals ask the Court to conclude that Monmouth, and its follow-on case In re Medicare Reimbursement Litigation, require the opposite outcome. They note that those cases interpreted similar language to that which is now included in the "examples" provision. However, those cases interpreted an outdated, substantially different regulation and do not direct the outcome here. To interpret the regulation that way would, in effect, restore Monmouth, notwithstanding the contrary changes to the regulatory text and concurrent explanation in the regulatory history. That would inappropriately subvert the regulatory intent of CMS.

Accordingly, the Court concludes that CMS does not obligate itself to reopen cost reports by notifying a contractor that a prior determination was inconsistent with applicable law. All else equal, CMS "may" direct contractors to reopen cost reports due to a decision's inconsistency with law. 42 C.F.R. § 405.1885(c). But "a writ of mandamus is not available to compel [this] discretionary act[]." Wightman-Cervantes v. Mueller, 750 F. Supp. 2d 76, 81 (D.D.C. 2010)

---

[6] Subsequent amendments to the reopening regulation are not material here. See Medicare and Medicaid Programs, 78 Fed. Reg. 75195, 75169 (Dec. 10, 2013) (amending subsections (a) and (b) to clarify the specific matters at issue subject to reopening); Medicare Program, 85 Fed. Reg. 58432, 59019–20 (Sept. 18, 2020) (amending subsection (b) concerning dates of receipt and delivery).

(quoting <u>Cox v. Sec'y of Lab.</u>, 739 F. Supp. 28, 30 (D.D.C. 1990); <u>see</u> <u>Heckler v. Ringer</u>, 466 U.S. 602, 616 (1984).

### C.  Mandamus

Here, it is plain that CMS has not issued any such directive to reopen cost reports on account of the Retroactive DGME Rule.  In the Final Rule adopting the revisions to the DGME weighting rule, CMS explained that some commentators "urged [CMS] to apply 42 CFR 405.1885(c)(1) to direct contractors to reopen cost reports."  Retroactive DGME Rule, 87 Fed. Reg. at 49070.  But CMS expressly declined.  <u>Id.</u>  Because CMS did not "explicit[ly] direct[]" contractors to reopen settled cost reports, mandamus does not lie, even though CMS gave explicit notice that prior determinations were based on a weighting formula inconsistent with the statute. <u>See</u> <u>id.</u> at 49069.[7]

The hospitals' mandamus argument also fails for a further reason.  The "examples" provision only applies when the contractor's decision was "inconsistent with the applicable law, regulations, CMS ruling, or other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS in effect, and as CMS understood those legal provisions, at the time the determination or decision was rendered by the contractor." 42 C.F.R. § 405.1885(c)(1)(i).  The hospitals urge that, by making the DGME weighting rule retroactive to 2001, CMS altered the law that was "in effect, and as CMS understood [it]" when the decisions were rendered.  Pls.' Mot. at 25.  Yet the retroactive regulation was plainly not in effect at the time the contractors' decisions were rendered.  The contractors' decisions, therefore,

---

[7] The Court agrees with the hospitals that under <u>Monmouth</u>, 257 F.3d at 813–14, CMS's statements in the Federal Register constituted "explicit notice" that the prior regulation was inconsistent with applicable law, even though these statements did not amount to an explicit direction.

could not have been unlawful as CMS understood the law at that time.  The hospitals' strained gloss on the regulation is not persuasive.

## II.    Prohibited Reopenings

CMS further contends that an order of mandamus is unavailable here because the reopening regulations affirmatively <u>prohibit</u> CMS from reopening prior determinations based on a "change of legal interpretation or policy by CMS in a regulation . . . , whether made in response to judicial precedent" or otherwise.  Def.'s Cross-Mot. & Opp'n at 24 (citing 42 C.F.R. § 405.1885(c)(2)); <u>see</u> Retroactive DGME Rule, 87 Fed. Reg. at 49,070.  The hospitals respond that this provision is inapplicable when the "change of legal interpretation or policy" occurs because CMS abandoned an impermissible legal interpretation.  <u>See</u> Pls.' Mot. at 29–30; Pls.' Reply & Opp'n at 17.

Once again, the plain text of the regulation is decisive.  The regulation prohibits reopening when CMS changes its interpretation or policy in response to a judicial precedent.  In the ordinary sense, CMS <u>did</u> change its interpretation of what the law required after <u>Hershey I</u>.  In the context of that rulemaking, CMS shifted its position on the formula that would satisfy the statutory requirements.  The hospitals nonetheless urge that the prohibition does not apply because CMS's prior interpretation of the statute was impermissible and, therefore, a "nullity."  Pls.' Mot. at 29; <u>see</u> Pls.' Reply & Opp'n at 17 (contending that the prior regulation was "not an interpretation but an ultra vires deviation from the statute" and "any 'policy' contrary to the statute was a nullity").[8] But they offer no valid reason to apply this gloss on the text.  And even taking the hospitals' argument on its own terms, it is unpersuasive because CMS's existing regulation remained on the

---

[8]  The hospitals note that CMS took the position after <u>Hershey I</u>, that CMS "'has no promulgated rule governing' DGME payments to teaching hospitals over the cap for cost reporting periods beginning on or after October 1, 2001."  Pls.' Mot. at 29 (quoting Medicare Program, 87 Fed. Reg. 28108, 28411 (May 10, 2022) (proposed rule)). However, in the final rule, CMS agreed with commenters who objected to that statement because <u>Hershey I</u> "did not vacate the rule."  <u>Retroactive DGME Rule</u>, 87 Fed. Reg. at 49069.

books.  In <u>Hershey I</u>, Judge Kelly held the prior DGME weighting regulation unlawful <u>as applied</u> to the plaintiffs in front of him.  2021 WL 1966572, at *5.  But he did not vacate the rule or hold it invalid in all circumstances.

The regulatory history further confirms that the prohibitory language of the reopening regulation applies to this situation.  Like the discretionary reopening provision discussed earlier, this prohibitory provision was added to the reopening regulations in the wake of <u>Monmouth</u>.   In <u>Monmouth</u>, the D.C. Circuit concluded that CMS was obligated to reopen cost reports having admitted that its interpretation was "contrary to the applicable law in four judicial circuits."  257 F.3d at 813.  When CMS revised the regulation months later, it emphasized that reopening was foreclosed under similar circumstances.  Responding to a commenter who believed that "<u>when the courts find a CMS policy unlawful</u>, and the agency revises its policy to comport with the courts' decisions, providers should be entitled to reopening and application of the new policy within applicable time limits," CMS stated that the revised regulation "clarifies our longstanding view that a change of legal interpretation or policy by CMS, whether made in response to judicial precedent or otherwise, is not a basis for reopening an intermediary determination or decision under § 405.1885."  Amended Reopening Rule, 67 Fed. Reg. at 50099 (emphasis added).  Here, in response to <u>Hershey I</u>, CMS promulgated a revised regulation intended to correct what it then understood to be an inconsistency between the existing regulation and the governing statute.  Its action was a "change of legal interpretation or policy by CMS in a regulation . . . made in response to judicial precedent," 42 C.F.R. § 405.1885(c)(2), and thus not a basis for reopening.[9]

---

[9] The hospitals contend that CMS's intent to overrule <u>Monmouth</u> is irrelevant here, because CMS promulgated a retroactive rule, and <u>Monmouth</u> and <u>In re Medicare Reimbursement Litigation</u> did not involve retroactive rules.  Pls.' Reply & Opp'n at 20–21.  However, the operative regulation does not make an exception for retroactive rules.

"[It] is well settled that a writ of mandamus is not available to compel discretionary acts."
Wightman-Cervantes, 750 F. Supp. 2d at 81 (quoting Cox, 739 F. Supp. at 30); see Heckler, 466
U.S. at 616.  It follows that a writ of mandamus is certainly unavailable to compel a prohibited act.
Accordingly, the hospitals are not entitled to mandamus.

## Conclusion

In light of the regulatory changes discussed above, Monmouth and In re Medicare
Reimbursement Litigation (which re-applied the prior reopening regulations) are not valid
interpretations of CMS's present, revised regulations.  It is no longer viable to say that CMS has a
mandatory duty to reopen once CMS has provided notice of a legal inconsistency, because the new
regulations provide that any CMS-directed reopening is discretionary, that CMS only directs a
reopening with an explicit directive, and that reopenings based on changes in legal interpretation
or policy are prohibited.  Accordingly, 42 C.F.R. § 405.1885(c)(1) does not impose a clear, non-
discretionary duty on CMS to reopen the hospitals' cost reports.

Having concluded that CMS is not under a clear, non-discretionary duty to reopen the
hospitals' cost reports, the Court need not address any of the parties' further arguments.[10]  The
lack of a clear duty to act and a corresponding clear right to relief requires the Court to deny
mandamus.  Accordingly, the Court will deny the hospitals' motion for summary judgment and
grant CMS's cross-motion for summary judgment.  An Order consistent with this Memorandum
Opinion will issue on this date.

---

[10] The Court notes that the parties disputed whether, assuming a duty existed, CMS would be required to
reopen all the hospitals' historical cost reports that relied on the prior DGME weighting formula, or if any reports
finalized more than three years prior to promulgation of the revised regulation were time-barred under CMS's
regulations.  See 42 C.F.R. § 405.1885(b).  The parties also disputed whether the hospitals demonstrated that they
lacked an adequate, alternative remedy to mandamus, where the hospitals did not seek judicial review of the Board's
decision that it lacked jurisdiction to entertain their request to reopen historical cost reports on this basis.  See 42
U.S.C. § 1395oo(f).  The parties finally disputed whether equitable considerations favor mandamus.  The Court need
not reach any of these questions.

/s/
_____

JOHN D. BATES
United States District Judge

Dated: August 6, 2024